

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
S. DISTRICT COURT
TRICT OF MARYLAND

2005 AUG 16 P 3: 05

CLERK'S OFFICE
AT BALTIMORE

MICHAEL IMGARTEN  :
    Plaintiff/Counter-Defendant  :

          v.  :

BELLBOY CORPORATION, et al.  :
    Defendants/Counter-Plaintiffs  :

BY&mdash;&mdash;&mdash;&mdash;&mdash;DEPUTY

CIVIL NO. L-00-3178

## MEMORANDUM

Pending are the following:

(i)      **Michael Imgarten's** ("Imgarten") Motion for Attorneys' Fees and Costs as the prevailing party under the Maryland Wage Payment and Collection Law ("Payment Law");

(ii)     **Imgarten's** Bill of Costs filed under Rule 54(d) of the Federal Rules of Civil Procedure;

(iii)    **Bellboy Corporation and Bellboy Import Corporation's (collectively "Bellboy")** Bill of Costs filed under Rule 54(d) of the Federal Rules of Civil Procedure;

(iv)    **Imgarten's** motion under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on Bellboy's "Fuddruckers" claim;

(v)     **Bellboy's** motion under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on Imgarten's wage payment claim;

(vi)    **Imgarten's** motion for pre-judgment interest on the sum of $808,927, which is the amount of unpaid wages that the jury awarded to him under the Payment Law; and

(vii)   **Bellboy's** motion for pre-judgment interest on the sum of $40,704.79, which is the stipulated value of the checks from Fuddruckers that the jury concluded Imgarten had wrongfully converted.

After extensive briefing, the Court held a hearing on February 24, 2005. For the reasons set forth herein, the Court will, by separate Order: (i) GRANT Imgarten's Motion for Attorneys'

Fees and Costs under the Payment Law, (ii) AWARD Imgarten attorneys' fees under the

Payment Law in an amount to be determined after Imgarten supplies additional information, (iii)

AWARD Imgarten costs under the Payment Law in an amount to be determined after Imgarten

supplies additional information, (iv) DENY AS MOOT Imgarten's Bill of Costs filed under

FRCP 54(d), (v) DENY Bellboy's Bill of Costs filed under FRCP 54(d), (vi) DENY Imgarten's

Rule 50 motion, (vii) DENY Bellboy's Rule 50 motion, (viii) AWARD pre-judgment interest to

Imgarten in the amount of $273,800.32, and (ix) AWARD pre-judgment interest to Bellboy in

the amount of $14,068.85.

## I.    A Brief History of the Case.

This case centers on acrimonious charges and counter-charges exchanged between

Michael Imgarten and his former employer, Bellboy.  Imgarten sued first for unpaid profit-

sharing bonuses.  Bellboy counter-sued, alleging a host of business torts.  The litigation was

roiled by a series of strident discovery disputes that required repeated hearings to resolve.

Although the case was filed on October 24, 2000, it did not reach the summary judgment stage

until the winter of 2004.

In a thirty-five page Memorandum and Order, the Court, on March 30, 2004, dismissed

most of the claims Bellboy asserted in its extensive ten-count Amended Counterclaim.  Having

narrowed the issues, the Court referred the case to a Magistrate Judge for settlement talks.  After

the settlement effort failed, the case went to trial on Imgarten's wage payment claim and

Bellboy's surviving counterclaims.

The trial lasted for fifteen days beginning on October 4, 2004.  Before submitting the case

to the jury, the Court dismissed all of the remaining counterclaims but one, a conversion claim

(Count 4), which charged that Imgarten had improperly deposited into his personal account checks from Fuddruckers payable to Bellboy. On October 27, 2004, the jury awarded Imgarten $808,927 as unpaid wages and exemplary damages of $233,244, for a total of $1,042,171.[1] The jury found in favor of Bellboy on its conversion counterclaim, which the parties had stipulated was worth $40,704.79. Following trial, the parties submitted and briefed the issues enumerated above.

## II.    A Brief History of the Dispute.

Martin Bell ("Bell") and Michael Imgarten are veteran players in the business of exporting food from the United States to the Middle East. Bell, who runs two Minnesota corporations, Bellboy Corporation and Bellboy Import Corporation, has been marketing foodstuffs to Middle Eastern countries for three decades. Imgarten has been selling to the Middle East for more than twenty years, including a five-year stint during which he lived in Saudi Arabia.

In 1992, Monfort International, a division of the agricultural conglomerate ConAgra, hired Imgarten to help it establish a presence in the Middle East. In 1996, Bellboy, which had a longstanding business relationship with Monfort, purchased Monfort's Middle East export business. Bellboy operated the acquisition as an unincorporated division known as American Food Services International ("AFSI"). AFSI's business office was located in Aberdeen, Maryland, and its shipping and distribution warehouse was located in Baltimore.

---

[1]   The jury also awarded Imgarten $808,927 in unpaid wages on his breach of contract claim. This award is duplicative and does not serve to increase the total.

3

As part of the acquisition, Bellboy hired Imgarten to manage AFSI and agreed to pay him a salary plus a percentage of AFSI's profits. This much is not in dispute. The parties disagree, however, as to the correct method of calculating AFSI's profits (net or gross) and the percentage (30% or 35%) to be applied.

Imgarten's employment with Bellboy was unharmonious; Imgarten and Bell frequently disagreed over Imgarten's compensation and other matters. To effect a business divorce, Imgarten offered to purchase AFSI from Bellboy in mid-2000. During the ensuing negotiations, both sides opened talks with the owner of the Baltimore warehouse that housed AFSI's distribution center under a month-to-month lease.

On October 20, 2000, after his bid to purchase AFSI ended unsuccessfully, Imgarten resigned and formed Imgarten International, Inc., a competing food export company. Imgarten acquired a lease of the Baltimore warehouse, and he attracted several of AFSI's employees to the new company. Shortly after his resignation, Imgarten filed this lawsuit against Bellboy to recover unpaid wages and other income that he claimed were due.

Imgarten's Second Amended Complaint, which predicated federal jurisdiction on diversity of citizenship, advanced alternative theories of breach of contract and violation of the Maryland Wage Payment and Collection Law.[2] The Payment Law, Md. Code Ann., Lab. & Empl., § 3-501, et seq., prohibits unauthorized deductions from wages, requires prompt payment of wages on termination, and provides employees with a private right of action to recover unpaid

---

[2] Imgarten also asserted quantum meruit and declaratory judgment claims based on Bellboy's failure to pay wages. Imgarten abandoned his declaratory judgment claim at the summary judgment stage and did not press his quantum meruit claim at trial because it was redundant to his other claims.

wages.  Upon a finding that an employer has withheld wages in the absence of a bona fide

dispute, the jury may award liquidated damages, and the court may award reasonable attorneys'

fees and costs.

In December, 2000, Imgarten International became fully operational.  On December 15,

2000, Bellboy filed a multi-count Counterclaim and, a month later, moved for a preliminary

injunction to halt Imgarten's business operations.  Bellboy accused Imgarten of a wide range of

misconduct, including violations of the Lanham Act, misappropriation of trade secrets,

interference with existing contracts and prospective business relationships, and RICO violations.

In a phrase that would be oft-repeated during the litigation, Bellboy's counsel charged that

Imgarten "stole our business, stole our customers, stole our lease, and stole our employees."

The parties presented the Court with two opposed views of reality.  Imgarten charged that

Bellboy was using a baseless, "kitchen sink" counterclaim to grind down a small competitor.[3]

Bellboy charged that Imgarten's misconduct, both as an employee and a competitor, had

seriously damaged its business, wiped out profits from past years, and destroyed future

profitability.

Because these views could not be reconciled without discovery, the Court denied the

preliminary injunction motion and issued a scheduling order.  The ensuing discovery phase was

---

[3] Bellboy's Amended Counterclaim contained the following counts: (1) false
designation of origin under the Lanham Act, (2) misappropriation of trade secrets under
the Maryland Uniform Trade Secrets Act, (3) "misappropriation of products"
(confidential business information, data files, and computer programs), (4) conversion,
(5) civil conspiracy, (6) interference with Bellboy's lease on its North Avenue warehouse,
(7) interference with prospective advantage (regarding the alleged diversion of the
customers known as "the BX customers"), (8) breach of fiduciary duty, (9) RICO, and
(10) RICO conspiracy.

extraordinarily hard fought and vexatious, including allegations of evidence destruction, witness

intimidation, withholding of evidence, and misbehavior at depositions.  Sorting through these

disputes required many in-court hearings, telephone conferences, and even the appointment of a

special discovery master.[4]

While both sides were guilty of roiling the discovery waters, the Court, at a hearing,

observed that, "Mr. Imgarten's side has borne the brunt of [Bellboy's] non-production."  (Docket

No. 207 at 14.)  Although the Court was inclined to award sanctions to Imgarten, it deferred a

final ruling until after trial, when the merits of the case would be clearer.  Was Imgarten a

faithless scoundrel or simply a good and honest employee who was being punished for leaving

and competing?

Following the close of discovery, the Court held summary judgment hearings on two

days.  The results are set out in the Court's March 30, 2004 Memorandum and Order.  Although

Imgarten's suit claimed unpaid commissions for 1996-2000, he sought partial summary judgment

(as to liability) for only two of those years, 1999 and 2000.  Imgarten conceded that the amount

due was open to dispute.  He, nevertheless, argued that he was owed something because AFSI's

own financial statements disclosed a profit for both years.

In opposing summary judgment, Bellboy speculated that its financial statements for 1999

and 2000 might be incorrect because they did not restate possible losses incurred by the company

as a result of Imgarten's alleged misconduct.  The Court ruled that Bellboy could not rely on such

---

[4] With the agreement of both sides, the Court appointed Juliet Eurich, Esquire, to
investigate Bellboy's contention that Imgarten had failed to produce hard copies of
discoverable documents culled from computer back-up tapes.  Ms. Eurich found that
Imgarten was not guilty of any discovery violations.

an argument. Although the discovery period had long since closed, Bellboy had produced no

evidence to contradict its 1999 and 2000 AFSI financial statements. Rather, Bellboy simply

speculated that Imgarten's conduct "may likely require recalculations of Bellboy's financial

statements for 1999 and 2000." Mere speculation cannot raise a jury issue.

Accordingly, the Court ruled that AFSI had been profitable in 1999 and 2000. It left for

the jury to determine whether Bellboy's agreement to pay an annual bonus was enforceable (there

being no writing)[5] and the amount of the bonus.

Imgarten also moved for summary judgment on all ten counts of Bellboy's Amended

Counterclaim. The motion met with overwhelming success because Bellboy, despite the

opportunity to conduct full discovery, produced little or no evidence to sustain the majority of its

allegations. Like a mirage, most of Bellboy's dramatic charges of wrongdoing vanished upon

close examination. A brief discussion of the various counts demonstrates this point.

Count 1 (Lanham Act) alleged false designation of origin. This claim failed because

Bellboy offered no evidence whatsoever of secondary meaning.

Counts 2 and 3 (Maryland Uniform Trade Secrets Act) alleged that Imgarten had

misappropriated trade secrets and confidential business information, including computer files,

business forms, translations, and proprietary information about customers and vendors. This

---

[5] In its summary judgment opinion, the Court noted the absence of any written
documents signed by Bellboy, the party to be charged, addressing the method for
calculating AFSI's profits and the percentage to be applied. The Court stated that the
absence of a contract laying out the material terms of the profit-sharing plan might render
the promise to pay unenforceable. Alternatively, the missing terms might be supplied by
parol evidence, or the bonus agreement might be enforceable under the doctrines of
unjust enrichment or promissory estoppel. Because neither side made any attempt to
analyze these issues, they could not be resolved on summary judgment.

claim failed for lack of proof.  Bellboy produced no evidence from which a fair-minded jury

could conclude that Imgarten had stolen Bellboy's or AFSI's computer files, business forms, or

translations.  Bellboy, which had the burden of proof, also failed to explain what customer and

vendor information was protected, why such information qualified as a trade secret, and how

Imgarten had misappropriated the secrets.

Count 4 (conversion) alleged that Imgarten was guilty of conversion because (i) he had

made improvements to AFSI's warehouse intending that he would benefit personally when his

new company took over the lease, and (ii) he had deposited into his own account checks written

to AFSI by Fuddruckers, the fast food company.  The only evidence that Bellboy offered to

support its warehouse conversion claim was unexplained, unauthenticated e-mail traffic between

Imgarten and the United States Navy.  Accordingly, that claim failed.  The Court did, however,

deny Imgarten's summary judgment motion as to the Fuddruckers checks, which were clearly

payable to AFSI and not to Imgarten personally.  While Imgarten contended that his side deal

with Martin Bell entitled him to the checks, Bell denied that contention.

In Counts 5 (civil conspiracy) and 7 (interference with prospective advantage), Bellboy

claimed that, during his employment with AFSI, Imgarten had contacted AFSI's customers in an

attempt to divert their business to the new company he was forming.  The Court ruled that the

evidence on this issue (the so-called "BX Order issue") was mixed and had to be decided by the

jury.

In Count 6 (business interference), Bellboy claimed that Imgarten had interfered with

Bellboy's month-to-month lease on its Baltimore warehouse by inducing the Landlord to

terminate its lease with Bellboy and to enter into a long-term lease with Imgarten.  The Court

8

denied summary judgment, ruling that there was a dispute of fact regarding whether Bellboy had allowed Imgarten to conduct negotiations with the Landlord on his own account.

Count 8 (breach of fiduciary duty) was dismissed as legally insufficient because there were other remedies open to Bellboy for the alleged wrongs.

Counts 9 (RICO) and 10 (RICO conspiracy) failed because Bellboy could not prove a "pattern of racketeering activity" required to elevate an ordinary business dispute into a treble-damage RICO case.

After summary judgment, therefore, all that remained of the counterclaim was (i) Count 4, conversion of the Fuddruckers checks, (ii) Count 6, interference with Bellboy's month-to-month warehouse lease, and (iii) Count 7, interference with prospective advantage regarding the BX customers.  Because the case had been substantially narrowed, the Court referred it to a Magistrate Judge for settlement talks.  When those talks failed, the Court set in the case for a jury trial.

During the fifteen-day trial, Bellboy was given full scope to prove its counterclaim. Nevertheless, the Court, due primarily to Bellboy's failures of discovery, granted judgment as a matter of law on each of the surviving claims save the Fuddruckers conversion claim.

Regarding Count 6, Bellboy stated at trial that the only damages it was seeking were the costs of relocating to another warehouse in New Jersey.[6]  Bellboy, however, never disclosed its

---

[6] On the liability issue, Imgarten testified that he had wanted to lease the AFSI warehouse himself in the event that his negotiations to purchase AFSI from Bellboy were successful.  According to Imgarten, Bell had authorized him to negotiate with the Landlord.  Martin Bell, however, denied having given Imgarten such permission.

relocation costs during discovery. Accordingly, the Court dismissed the claim for failure of discovery.

Count 7 was likewise dismissed on a Rule 50 motion for failure of discovery.[7] In order to prove a claim of lost profits, Bellboy was required to identify the BX customers, to show past sales and profits, to show that Imgarten wooed them improperly, and to demonstrate the likelihood of future sales and profits had Imgarten not intervened. Bellboy never undertook the required customer-by-customer analysis.[8] Not only was this failure a discovery violation, but a jury verdict in Bellboy's favor would have been based on speculation rather than fact.

Out of the extensive, wide-ranging counterclaim, therefore, the only issue that reached the jury involved the conversion of checks having a value of $40,704.79.

---

[7] Although Bellboy's proof as to liability was sufficient to reach a jury, it was thin. The BX orders involved a number of longstanding customers whose credit, for a variety of reasons, had eroded. At Martin Bell's insistence, AFSI tightened their credit requirements, jeopardizing their ability to place any new orders. Imgarten, who was negotiating with Bell to purchase AFSI, disagreed with Bell's actions because he considered the customers creditworthy, and he was counting on them to remain customers of AFSI if he purchased the business. Imgarten, therefore, helped out with the financing himself. He testified at trial that he did so with Bell's permission. Some of the customers have done business with Imgarten International, Inc., and others have gone out of business, he also testified. Bellboy's evidence to the contrary was legally sufficient, but thin. Bell testified that Imgarten had acted without his permission. Bellboy did not, however, offer any testimony from the BX customers themselves. Thus, the record is devoid of their perspective.

[8] Bellboy's initial expert report was unsatisfactory. It was not limited to customers associated with the BX Orders; rather, it listed all the customers who, for whatever reason, had reduced their business with Bellboy after Imgarten's departure. The report was not broken down customer-by-customer, and one could determine the lost profits that Bellboy was claiming for any given customer only by performing a series of complicated calculations. Although Bellboy attempted to cure the defects in the report, the effort was too little and too late. Bellboy did not provide its revised report to Imgarten until the last business day before trial, well out of time. The revised report also failed to analyze lost business customer-by-customer.

The jury returned a verdict totaling $1,042,171 on Imgarten's claims, which included $233,244 of additional statutory damages under the Maryland Wage Payment and Collection Law.  The enhanced statutory damages resulted from the jury's finding that a substantial portion of the wages due in 1999 and 2000 had been withheld not as the result of a bona fide dispute. The verdict in favor of Imgarten can be broken down as follows:

| Period | Unpaid Wages | Enhanced Statutory Damages |
|---|---|---|
| Four months ended 6/30/96 | $1,735 | $0 |
| Twelve months ended 6/30/97 | $116,474 | $0 |
| Six months ended 12/31/97 | $94,039 | $0 |
| Twelve months ended 12/31/98 | $176,111 | $0 |
| Twelve months ended 12/31/99 | $224,068 (no bona fide dispute as to $91,158) | $136,737 |
| Ten months ended 10/31/00 | $196,500 (no bona fide dispute as to $32,169) | $96,507 |
| Total: | $808,927 (no bona fide dispute as to $123,327) | $233,244 |

The jury also returned a verdict in favor of Bellboy on its one surviving counterclaim, which was worth the stipulated sum of the face value of the checks, $40,704.79.  The net value of all the findings on the Verdict Form was in favor of Imgarten for $1,001,466.

III.    **Imgarten's Motion for Attorneys' Fees and Costs.**

Imgarten seeks reimbursement of attorneys' fees ($916,681) and costs ($207,404) that he

incurred in litigating the case.  In addition, Imgarten asks the Court to adjust the award of

attorneys' fees upward by at least 10% and, therefore, to award him an additional $91,668.

Courts of the United States, including the federal courts, follow the "American Rule,"

meaning that each party to a lawsuit must bear its own attorneys' fees unless there is an express

statutory authorization to the contrary.  Hensley v. Eckerhart, 461 U.S. 424, 429 (1983).  Under

the American Rule, each party must also bear its own litigation costs except a limited number of

enumerated costs (e.g., filing fees and deposition transcripts) that are awarded to a prevailing

party under Rule 54(d) of the Federal Rules of Civil Procedure.

Imgarten is relying upon the Payment Law, which provides that if, in an action under that

Act, an employer has withheld the wage of an employee in violation of the Act and not as a result

of a bona fide dispute, the employee may be awarded an amount not exceeding three times the

wage and reasonable counsel fees and costs.  Md. Code Ann., Lab. & Empl., § 3-507.1(b) (1999).

This fee- and cost-shifting statute applies because the jury found that Bellboy had failed to pay

amounts ($91,158 in 1999 and $32,169 in 2000) which were, in the words of the Verdict Form,

"not attributable to a bona fide dispute."

The Maryland General Assembly added the counsel fee provision to the Payment Law in

1993.[9]  In framing the law, the legislature debated whether to provide for an automatic award of

counsel fees and treble damages whenever a wage was found to be due. The Maryland Volunteer

---

[9]  The Maryland Court of Appeals examined the legislative history of the statute in
Friolo v. Frankel, 819 A.2d 354 (Md. 2003).

Lawyers Service reported that the majority of wage claims were submitted by low income people and involved between $150 and $200.  Proponents of an automatic award expressed concern that such employees could not obtain legal representation because the recovery (and hence the legal fees) would be small.  Opponents, employers primarily, resisted the change as contrary to the American Rule.  The legislature struck a balance that allowed a reasonable fee under § 3-507.1 "only in those situations where the employer acted willfully—in the absence of a bona fide dispute."  Friolo v. Frankel, 819 A.2d 354, 363-64 (Md. 2003).

In applying the statute to the instant case, two threshold questions arise.  Does the statute apply when the plaintiff is a highly compensated executive rather than a "working man?"  Does the statute apply when the wages are based on a bonus plan rather than an hourly rate multiplied by the number of hours worked?  These questions are germane because Imgarten was a top level executive, the wages in controversy amounted to hundreds of thousands of dollars, Imgarten had no difficulty retaining top notch lawyers, he could afford to pay substantial legal bills as they fell due, and the bonuses he claimed were based upon a percentage of the annual profits of a sophisticated food export business.

In 2003, the Maryland Court of Appeals answered these questions by implication in Friolo.  Although the plaintiff was not a CEO, she was a medical biller employed by a medical practice.  The trial court found that her compensation should have included a $30,000 annual salary plus a bonus of 5% of the monthly receivables collected.  Although the appeals court

remanded the case, it concluded that the plaintiff was entitled to an award of attorneys' fees if there was no bona fide dispute as to her entitlement to a bonus.[10]

The <u>Friolo</u> Court provided considerable guidance concerning how to apply the Payment Law. The counsel fee provisions are "remedial in nature and should therefore be given a liberal interpretation." <u>Friolo</u>, 819 A.2d at 364. Whether to award any counsel fee is discretionary, but that discretion should be "exercised liberally in favor of allowing a fee." <u>Id.</u> at 361. When an employer has willfully withheld wages, "courts should exercise their discretion liberally in favor of awarding a reasonable fee, unless the circumstances of the particular case indicate some good reason why a fee award is inappropriate." <u>Id.</u> at 364.

The <u>Friolo</u> Court also determined that the federal courts' lodestar approach, with its adjustments, is the "presumptively appropriate methodology" to apply under the Payment Law. <u>Id.</u> at 371. The lodestar approach begins by multiplying the hourly rate of the worker's attorney times the hours worked. The adjustments involve determining the reasonableness of the hourly rate, eliminating excessive, redundant, and unnecessary hours, and determining whether the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for a fee award.

The <u>Friolo</u> Court voiced its approval of the twelve factor <u>Johnson</u> test laid out by the Fifth Circuit Court of Appeals in a Title VII case of that name. <u>Id.</u> at 370 (citing <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974)). As the <u>Friolo</u> Court noted, the <u>Johnson</u>

---

[10] <u>See also</u> <u>Baltimore Harbor Charters, Ltd. v. Ayd</u>, 759 A.2d 1091, 1102 (Md. Ct. Spec. App. 2000) (stating that § 3-507.1 does not "exempt a particular class of employees, such as the 'executives' that BHC suggests should be excluded"), <u>aff'd in part and vacated in part</u>, 780 A.2d 303 (Md. 2001).

14

factors are identical or similar to those enumerated in Rule 1.5 of the Maryland Rules of Professional Conduct, which requires a lawyer's fee to be reasonable. Time spent by non-lawyers (e.g., paralegals and investigators) must be excluded.  The fee agreement between the worker and his attorney should be taken into consideration as should the amount of actual fees and expenses paid.

While the Friolo decision is helpful, there are several factors that make the fee calculation in the instant case difficult, as follows:

(i)  The jury found that Bellboy failed to pay Imgarten wages of $808,927 for the years 1996-2000.  Of this sum, $685,600 (85%) was subject to a bona fide dispute and $123,327 (15%) was not.  Does the jury's finding of willfulness as to a portion of the wages withheld make Bellboy liable for all the attorneys' fees and expenses or only part?

(ii)  In his Second Amended Complaint, Imgarten claimed total unpaid wages of $1.4 million.  The jury awarded $808,927 plus statutory damages of $233,244.  Should Imgarten be treated as having been completely successful (because he obtained a recovery) or only partly successful (because he recovered only a portion of the amount he requested)?

(iii)  Should fees and costs be apportioned between Imgarten's affirmative wage claim and his defense to the counterclaim?  If the case consisted of just the counterclaim, the Payment Law would not apply, and Imgarten would be required to bear the entire cost of his defense. On the other hand, the counterclaim can be viewed as an attempt to defeat or offset the wage claim. Under that view, there would be no apportionment because Imgarten was required to overcome the counterclaim in order to recover on his own claim.

(iv) Bellboy succeeded on one, but only one, of its counterclaims (the Fuddruckers checks). Does Imgarten's loss on this issue detract from his status as the prevailing party?

### A.   The Johnson Factors.

Answering these questions requires the Court to view the litigation through the prism of the twelve Johnson factors, which include: (1) the time and labor required, (2) the novelty and difficulty of the issues, (3) the skill needed to litigate the case to a successful conclusion, (4) whether the attorney declined other (more profitable) work to pursue the case, (5) the lawyer's customary fee, (6) whether the fee is fixed or contingent, (7) time limitations that made the representation more taxing, (8) the amount at issue and the result obtained, (9) the experience, reputation and ability of the attorney, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Rather than discuss each of the twelve factors separately, the Court will cover them in a description of the litigation as a whole. The starting place is a calculation of the number of hours worked times the hourly rate. From the inception of the litigation to the hearing on, and briefing of, the post-trial motions, Imgarten's attorneys worked a total of 4,917 hours and billed Imgarten $916,681. While this sum is hefty, it is reasonable in terms of the litigation as a whole.[11]

---

[11] Large fee awards are not unheard of in this district. In 1999, the Honorable William M. Nickerson awarded $750,000 in attorneys' fees in a discrimination suit under the Americans with Disabilities Act and the Fair Housing Act. See Project Life, Inc. v. Ehrlich, Case No. WMN-98-2163 (unpublished decision attached as Exhibit A to Docket No. 215). In 2002, the Honorable Marvin J. Garbis awarded fees and costs in the amount of $412,040 in a First Amendment case. See Columbia Union Coll. v. Maryland Higher Educ. Comm'n, Case No. MJG-96-1831. Earlier this year, the Honorable Richard D. Bennett awarded fees of approximately $200,000 in an Individuals with Disabilities Education Act case. See Board of Educ. of Frederick County v. Summers, 358 F. Supp. 2d 462 (D. Md. 2005).

Two facts vouch for this conclusion. First, Imgarten paid his legal fees and expenses as they accrued.[12] His attorneys' bills are not, therefore, abstract invoices that have piled up, unpaid, year after year. The invoices submitted by Imgarten's attorneys represent marketplace billing decisions, and Imgarten, by paying them, has attested to their reasonableness.[13] Second, Imgarten's legal fees are presumptively in line with Bellboy's. The Court specifically asked Bellboy whether Imgarten's fees should be cut back because they were excessive when measured against Bellboy's. After taking time to analyze the issue, Bellboy stated that it was making no such argument.

Imgarten's litigation costs also appear to pass muster under the equivalency test. Typically, a party may recover costs only under Rule 54(d), which allows a court to reimburse a prevailing party for costs that fall within certain enumerated categories. See Fed. R. Civ. P. 54(d); 28 U.S.C. § 1920. Under cost-shifting statutes such as the Payment Law, a cost award is not confined to statutory categories, and a court may award the full amount of the costs incurred by the prevailing party. Relying on the Payment Law, Imgarten seeks the full amount of his costs, $207,404. Because there is no cost-shifting statute that applies to Bellboy's Fuddruckers Claim, Bellboy has filed only a Rule 54(d) Bill of Costs, and it has not provided the Court with a total of its overall litigation costs. The Court, therefore, cannot compare Imgarten's and

---

[12] Imgarten's expenses totaled $207,404. He paid approximately 75% of those expenses directly. The remainder were paid by his attorneys on his behalf and reimbursed by Imgarten.

[13] The fact that Imgarten has the financial means to pay his legal bills does not counsel against a fee award. See Bills v. Hodges, 628 F.2d 844, 847 (4th Cir. 1980) ("[T]he plaintiff's ability to pay attorneys' fees is not a special circumstance that would render an award of fees unjust.").

Bellboy's overall costs. Nevertheless, because both Bellboy and Imgarten have filed Bills of Costs under Rule 54(d),[14] the Court can compare the totals stated therein. The total stated in Imgarten's Bill of Costs ($39,237.12) is roughly the same as the costs submitted by Bellboy ($28,580.68).

Bellboy criticizes the number of firms (three) representing Imgarten and the number of attorneys who have billed time to the case. An examination of Imgarten's legal team shows that this criticism is unjustified. Over the course of the four year case, three principal attorneys represented Imgarten: Paul Gardner (Jefferson City, Missouri), Julie Janofsky (Baltimore), and David Wyand (Baltimore).[15] Gardner was apparently Imgarten's personal attorney, and he was brought into the case after it was filed in Baltimore.

When the complaint was filed in 2000, Janofsky and Wyand were members of the same firm; Janofsky a partner and Wyand an associate. As the years passed, Wyand emerged as lead litigation counsel for Imgarten, although Janofsky and Gardner played important roles. In 2003, Wyand joined a new firm. Because Wyand possessed so much institutional memory, it was practical for him to remain in the case, and he did.

When the suit was filed in 2000, the hourly rates charged by Wyand ($140), Janofsky ($225), and Gardner ($160) were reasonable for complex business litigation. As a concession to Imgarten, who was locked in an exceptionally protracted case, the attorneys did not apply their

---

[14] Imgarten filed a Bill of Costs in case the Court declined to award it costs under the Payment Law.

[15] Francis Brocato, Esquire, represented Imgarten during his business negotiations with Bellboy. After the lawsuit was filed, he stepped back to allow litigation counsel to handle the matter.

full rate increases to him.[16]  As the Court witnessed during hearings and at trial, the three

attorneys also divided up the issues to avoid duplication of effort.  Gardner was responsible for

(i) deposing the principal fact witnesses and Bellboy's expert, (ii) delivering the opening

statement and closing argument, (iii) conducting the direct examination of Imgarten, and (iv)

cross-examining Bellboy's controller and Bellboy's accounting expert.  Janofsky pulled the

laboring oar in several other areas, and Wyand took the lead for the remaining issues.  The Court

is satisfied that Imgarten's legal team represented him efficiently.

By any measure, this case was difficult, complicated, and protracted, and Imgarten's

attorneys displayed a high level of skill and experience.  Between the complaint and the

counterclaim, counsel were required to become versed in a number of substantive areas of the

law, including Maryland employment law, Maryland wage law, the Lanham Act, RICO, the

Maryland Uniform Trade Secrets Act, and a host of common law business torts.

Discovery was complicated.  Imgarten's counsel either took or defended over two dozen

depositions.  Document production involved thousands of pages of business records, financial

records, computer event logs, and e-mail traffic.  Discovery involved experts in the areas of

computers, the food export industry, and accounting.

Discovery was also extraordinarily contentious, and Imgarten's counsel filed a number of

(largely successful) motions to compel.  Were there no fee-shifting statute, the Court would

---

[16]  Janofsky charged Imgarten $225 per hour, despite the fact that her normal rate was $250-$275 per hour.  (Docket No. 207 at 16.)  In September 2004, Wyand's standard hourly rate increased to $225.  The hourly rate he charged Imgarten, however, never rose above $195.  (Id. at 17.)  Although Gardner typically charges $185 to $210 per hour, he only charged Imgarten $160 per hour for all pre-trial work and $190 per hour during the trial.  (Docket No. 209 at 4.)

award Imgarten sanctions under the discovery rules.  Based on their time records, Imgarten's counsel contend that they expended $91,509 worth of extra time in connection with unnecessary discovery disputes and proceedings.

The case involved numerous hearings and a long trial.  The Court was impressed by the quality of the attorneys' legal work, both written and oral.  Wyand displayed an exceptional mastery of the extensive record and the governing law.  Gardner and Janofsky also displayed a commendable grasp of their areas of responsibility.

The amount at issue was sizeable.  The jury awarded Imgarten $1,042,171.  Imgarten's attorneys believe that the verdict may well represent the largest individual statutory wage recovery in the history of Maryland jurisprudence.  This award was dwarfed, however, by the amount ($80,200,000 plus punitive damages) that Bellboy was claiming in its Amended Counterclaim.  Had not his attorneys fended off the counterclaim, Imgarten would have been driven out of business and into bankruptcy.

Several of the other Johnson factors merit a brief mention.  An attorney may be entitled to extra pay if he takes on an undesirable case.  Such is not the situation here.  Complex business cases are challenging, but they also allow attorneys a welcome opportunity to operate at the full range of their abilities.  The fees in this case were not contingent, so the attorneys' own pocketbooks were not at risk.  While the litigation imposed many deadlines and required late nights at the office, the time constraints were not unusual for complex business cases.  There is no indication that Imgarten was a difficult or unreasonable client.  The litigation required much of the attorneys' available time and they were charging less than their full hourly rates during the latter stages of the case.  Nevertheless, they made no showing that they were so busy that they

turned down matters that would have generated higher fees than those paid by Imgarten.[17]  In light of these factors, the Court finds that Imgarten is not entitled to the requested 10% upward adjustment.

Having described the attorneys' overall performance, the Court must now analyze the remaining <u>Johnson</u> consideration (success) in light of the Payment Law.  This brings us back to the four issues that <u>Friolo</u> and <u>Johnson</u> do not explicitly answer.  How should the Court evaluate (i) Imgarten's failure to recover all the wages he was seeking, (ii) the jury's finding that only 15% of the wages withheld were not subject to a bona fide dispute, (iii) the fact that most of the attorney time was spent fending off the counterclaim, and (iv) the jury's determination that Imgarten had converted the Fuddruckers checks?

Under the Lodestar approach, the fees awarded to a prevailing party must be proportional to the success achieved. Defining success is a relatively simple matter in cases involving only one issue. The task can be difficult, however, when the plaintiff fails to achieve some of the relief sought, loses on some issues, or the case involves some claims that trigger a fee-shifting statute and others that do not.

A body of case law has taken up these issues.  Some of the principles that have emerged are relevant to Imgarten's fee petition:

---

[17]  Although Imgarten's attorneys allege generally that their time could have been spent on other, full-rate matters, they provide no specifics.

(i)  The fee applicant bears the burden of establishing his entitlement to fees.[18]  The first step is to determine the hours reasonably expended multiplied by a reasonable hourly rate.[19]  The amount should be adjusted upward or downward depending on the results obtained.[20]

(ii)  The inquiry into the appropriate fee should not assume massive proportions.[21]  The judge has substantial discretion, and his statement of reasons should be clear and concise.[22]

(iii)  A party is "prevailing" if it succeeds on any significant issue.[23]  Two questions must be asked when a plaintiff succeeds only in part.  Were the unsuccessful claims related or unrelated to the successful ones?  Has the plaintiff achieved a level of success that makes the hours expended a satisfactory basis for the fee award?[24]

(iv)  Often all claims in a case (both successful and unsuccessful) will center on a common core of facts or related legal theories.  In those situations, counsel's time will usually be devoted to the overall litigation, making it difficult to divide the hours expended on a claim-by-claim basis.  In such a case, all claims should be regarded as related.[25]  Where, however, claims

-------------------

[18]  Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

[19]  Id. at 433.

[20]  Id. at 434.

[21]  Copeland v. Marshall, 641 F.2d 880, 896 (D.C. Cir. 1980); Hensley, 461 U.S. at 437.

[22]  Hensley, 461 U.S. at 437.

[23]  Id. at 433.

[24]  Friolo, 819 A.2d at 368 (citing Hensley, 461 U.S. at 434).

[25]  Hensley, 461 U.S. at 435.

are unrelated or "fractionable," courts should treat them as if they had been raised in separate lawsuits and refuse to award fees for work on the unsuccessful claims.[26]

(v)  A plaintiff who was unsuccessful at a stage of litigation that was, nevertheless, a necessary step to ultimate victory is entitled to attorneys' fees even for the unsuccessful step.  In other words, "plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit."[27]

(vi)  Those who elect a militant defense are responsible for the time and effort they extract from their opponents.  A party cannot litigate tenaciously and then complain about the time spent by the opposing party in response.[28]

---

[26]  Id. at 434-35; Lamphere v. Brown Univ., 610 F.2d 46, 47 (1st Cir. 1979).

[27]  Cabrales v. County of Los Angeles, 935 F.2d 1050, 1052 (9th Cir. 1991).

[28]  Copeland, 641 F.2d at 904 & n.53.

23

There are many ways that these guiding principles might be applied to this case.[29]   The

Court concludes that the most appropriate analysis divides the litigation into stages.

The Court believes that when Bellboy filed its counterclaim it genuinely believed that it

had been raided by Imgarten.  There was certainly smoke that could justify the inference of a fire.

Imgarten ended up with AFSI's lease, some of its employees, and certain of its former customers.

There were reports that Imgarten had stolen AFSI's property by hiding it in a tractor trailer or in

the drop ceiling of the warehouse.  Bellboy suspected that Imgarten had downloaded the contents

---

[29]   The potential outcomes include the following:

(i)  Imgarten's Second Amended Complaint sought $1.4 million in wages and treble damages on the whole amount.  Imgarten recovered $808,927 in wages and additional damages of $233,244.  Thus, depending on how the additional damage claim is viewed, Imgarten can be deemed as having achieved a victory of 60% or 20%.

(ii)  Of the $808,927 in wrongfully withheld wages, only $123,327 (15%) was not attributable to a bona fide dispute.  Imgarten could, therefore, be seen as entitled to 15% of the fees and expenses expended.

(iii)  Imgarten sought unpaid bonuses based on AFSI's profits for the years 1996-2000.  In some of its counterclaims, Bellboy argued that Imgarten had caused losses that, under accounting principles, must be attributed to those years.  Restating AFSI's financial statements would reduce the company's profits for 1996-2000, thereby reducing or eliminating Imgarten's bonuses, Bellboy contended.  Other counterclaims, however, concerned harms that would damage AFSI in subsequent years.  Imgarten might be viewed as entitled to the recovery of fees and expenses necessary to defeat the retrospective counterclaims but not the prospective ones.

(iv)  Imgarten succeeded on his wage claim and Bellboy succeeded on one of its counterclaims (Fuddruckers conversion).  The litigation might, therefore, be viewed as a split decision, with Imgarten receiving no attorneys' fees and costs.  Alternatively, Imgarten could be viewed as having no claim for attorneys' fees and expenses on the counterclaim as a whole.

(v)  Imgarten did not recover the full amount he was seeking, but he did succeed in recovering both back wages and exemplary damages.  He points out that Bellboy never offered to pay him any amount, and that he was required to litigate to the bitter end in order to obtain the first dollar due him.  Under this view, Imgarten would be entitled to his entire fee and cost claims because defeating the counterclaim was a necessary step on the road to recovery.

24

of AFSI's computers before leaving, and that he was using confidential information to gain an unfair competitive advantage.

These and other claims were exhaustively, albeit contentiously, explored during discovery. They were tested for legal sufficiency at the summary judgment stage. All but a few of the claims were found wanting and dismissed.

Only three of Bellboy's counterclaims survived to trial: the warehouse lease, the BX orders, and the Fuddruckers conversion claim. At trial, Bellboy was given every opportunity to sustain its allegations. Despite this opportunity, the Court dismissed the warehouse and BX claims for want of proof and failure to provide discovery regarding damages.[30]

Thus, only one of Bellboy's counterclaims, the Fuddruckers claim, reached the jury. Like mirages, all of the other claims asserted in Bellboy's extensive counterclaim proved insubstantial when approached and examined. This fact provides the best rationale for apportioning attorneys' fees. Until the Court's summary judgment ruling, the counterclaims can be viewed as fractionable. They dominated discovery, they dominated the summary judgment briefing, and the amount Bellboy was seeking dwarfed Imgarten's wage claim. After the summary judgment ruling, however, the wage claim was predominant. The counterclaim, the weakness of which Bellboy should have come to appreciate, existed only as a defensive weapon that might sully Imgarten's credibility with the jury or offset his wage claim.

---

[30] In his summary judgment motion, Imgarten argued that Bellboy could not satisfy its burden of proving damages at trial. The Court reserved the damages issue for trial, where the issue resurfaced and formed the foundation for the dismissal of Bellboy's BX and warehouse claims.

**B.      Apportionment of Attorneys' Fees.**

Following this rationale, the litigation can be divided into three phases.  The Court will award Imgarten the attorneys' fees he incurred in Phase One, which includes the pre-filing investigation and ends with the filing of the Counterclaim on December 15, 2000.  With one significant exception, each side will bear its own fees for Phase Two of the case, which began with the filing of the Counterclaim and ended with the Court's 2004 summary judgment opinion. Imgarten is entitled to the fees he incurred during Phase Three, which began with the summary judgment opinion and will end when the Court enters final judgment.

There is one corollary to the Court's approach.  Imgarten should recover fees that were unnecessarily incurred during Phase Two (the discovery/summary judgment phase) as a result of Bellboy's discovery violations.  Imgarten contends that he incurred fees of $91,509 in connection with unnecessary discovery disputes and proceedings, and he submitted detailed time records to support his position.  The Court, having reviewed the records, accepts this amount as reasonable.

Within two weeks from the date of this Memorandum, Imgarten shall file a breakdown of the fees that he incurred during Phases One and Three.  The Court will add the $91,509 attributable to Bellboy's discovery violations during Phase Two, and the resulting total will be the Court's award of fees to Imgarten.[31]

The Court appreciates that the sum being awarded is substantial, amounting to hundreds of thousands of dollars.  The sum also approaches the total recovered by Imgarten.  These facts

---

[31]  The attorney time records show that Imgarten incurred the entire $91,509 during Phase Two.  If this is incorrect, Imgarten shall notify the Court and, to avoid a double recovery, shall net out any part of the $91,509 that was incurred during Phases One and Three.

26

do not warrant a reduction in the interests of proportionality, however. Bellboy fought this case street by street and house by house. Bellboy did so knowing full well that the Payment Law might eventually force it to reimburse Imgarten. Having forced its adversary to incur substantial legal fees, Bellboy cannot complain about the size of the bill.

### C.   Apportionment of Costs.

The Court will apportion costs under the same formula. Within two weeks from the date of this Memorandum, Imgarten shall provide a breakdown of the litigation expenses (Rule 54(d) and otherwise) that he incurred during Phases One and Three, and the costs that were unnecessarily incurred during Phase Two as a result of Bellboy's discovery violations. The Court will award Imgarten as costs the sum that results from the above formula.[32] The Court finds that this is a reasonable method for awarding Imgarten the costs that he incurred during this protracted litigation. See Daly v. Hill, 790 F.2d 1071, 1084 n.18 (4th Cir. 1986) ("An expense award, like an attorney's fee, must adequately compensate counsel without resulting in a windfall.").

### IV.   Bellboy's Bill of Costs.

In its Bill of Costs, Bellboy seeks an award of $28,580.68. Rule 54(d) of the Federal Rules of Civil Procedure governs Bills of Costs and provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1).

---

[32] Under Rule 54(d), Imgarten would be entitled to the amount stated in his Bill of Costs, $39,237. In the unlikely event that the Court's above formula results in a lower award, Imgarten will recover $39,237. Because the Court is awarding Imgarten costs as the prevailing party under the Payment Law, the Court will, by separate Order, DENY AS MOOT Imgarten's Bill of Costs.

Although the jury returned a verdict in Bellboy's favor on the Fuddruckers Claim, it is not entitled to costs; under no definition could it be viewed as the prevailing party.[33]  In the context of the litigation, the Fuddruckers Claim was an afterthought added only six months before trial.[34] Bellboy's $40,704.79 verdict is dwarfed by the $1,042,171 that the jury awarded to Imgarten. See Hillside Enters. v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995) (concluding that because plaintiff "won a larger judgment, it can logically be considered the prevailing party" under Rule 54(d)).

Because Imgarten, not Bellboy, was the prevailing party, the Court will DENY Bellboy's Bill of Costs.

---

[33] See Cherry v. Champion Int'l Corp., 186 F.3d 442, 446 (4th Cir. 1999) (stating that district court has discretion to deny an award of costs).

[34] Bellboy did not raise the Fuddruckers Claim until the summary judgment stage, mentioning it for the first time in its opposition to Imgarten's summary judgment motion.

## V.    Imgarten's Rule 50 Motion.

Imgarten has moved for judgment as a matter of law on Bellboy's Fuddruckers Claim.[35] Imgarten advances the following supporting arguments: (i) Bellboy did not disclose the existence of the Fuddruckers Claim during discovery, (ii) Bellboy did not provide Imgarten with material documents relating to the claim, and (iii) Bellboy did not offer any evidence that it was entitled to the proceeds of the checks.  The Court will address each argument in turn.

### A.    Failure to Disclose Claim During Discovery.

Bellboy did not raise the Fuddruckers Claim until the summary judgment stage.  Imgarten objected because the claim was a new one and Bellboy had provided no discovery on it.  After hearing from both sides, the Court allowed Bellboy to amend its counterclaim.  The Court recognized that the claim was tardy, but it concerned a serious matter.  Because the claim was compartmentalized, any prejudice to Imgarten could be cured by a limited, one-issue re-opening of discovery.

Imgarten, but not Bellboy, was permitted to conduct discovery.  The Court issued an Order that required Bellboy to designate a FRCP 30(b)(6) corporate representative, specified the

---

[35] Rule 50 of the Federal Rules of Civil Procedure states, in part:

(a)    If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(b)    If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.

topics on which the designee was required to testify, and required the representative to produce all germane documents.  Imgarten has not shown that the discovery outlined by the Court was insufficient or that he had too little time to prepare a defense.

### B.    Alleged Failure to Disclose Documents.

Imgarten claims that, despite the Court's Order, Bellboy withheld certain files located in AFSI's Maryland offices.  Imgarten speculates that the Maryland files would have shown that he had a longstanding business arrangement with Fuddruckers (consented to by Bell) that entitled him to the proceeds of the checks.  Imgarten raised this discovery issue prior to trial through a motion for sanctions.  Bellboy countered with an affidavit from Ms. Eva Simpson, who stated that, over the course of several weeks, she participated in a file search for all discoverable documents.  The Court allowed Imgarten to take a brief, telephone deposition of Simpson to test the thoroughness of her search.

Imgarten's lawyers deposed Simpson on October 1, 2004, the last business day before trial. When trial began on October 4th, Imgarten made no mention of Simpson or the deposition. Not until the post-trial Rule 50 motion did Imgarten claim that Simpson's deposition showed that her search was incomplete.  When the Court asked Imgarten's counsel why they did not raise the issue during trial (when the Court might have been able to resolve the problem), counsel responded that there had not been a convenient time to do so.

The Court cannot accept this explanation.  During trial, counsel for both sides were not bashful about raising a host of issues.  Imgarten offers no explanation why this issue was out of the ordinary.  Accordingly, Imgarten waived the objection he now makes.  Even if the issue had been preserved, Imgarten would still lose on the merits.  Imgarten faults Simpson for failing to

search both Bellboy's Maryland and Minnesota files.  Such a search was not required because

Simpson testified that earlier in discovery she had carefully compared the two sets of files page

by page, finding them to be identical.  She was confident that she had found and produced all

pertinent documents.  Imgarten has offered no ground, other than suspicion, to discredit

Simpson's sworn testimony.

### C.      Bellboy Proved Conversion.

The Fuddruckers checks were made payable to AFSI[36] and mailed to AFSI's business

address.  The jury found that Bell did not indorse the checks to Imgarten, nor did he give

Imgarten authority to indorse the checks and deposit the proceeds into his personal account.  The

jury rejected Imgarten's testimony that Bell knew and approved of his side arrangement with

Fuddruckers.  Accordingly, Imgarten converted the checks, which were negotiable instruments

under the Maryland Uniform Commercial Code.[37]  See Md. Code Ann., Com. Law I §§ 3-

104(a),(c) & (f) (1997).

For the foregoing reasons, the Court will DENY Imgarten's Rule 50 motion.

## VI.    Bellboy's Rule 50 Motion.

Bellboy has moved for judgment as a matter of law, asserting the following grounds:  (i)

there was no legally sufficient basis for a reasonable jury to find the absence of a "bona fide

dispute" for the years 1999 and 2000, (ii) Imgarten's wage claims for 1996 and 1997 are barred

by the statute of limitations, and (iii) Imgarten materially breached his employment contract with

---

[36]  Fuddruckers made the checks payable to "American Foods."  Imgarten does not deny that "American Foods" refers to AFSI.

[37]  The jury must have found that Fuddruckers, by writing the checks to AFSI rather than to Imgarten personally, intended for AFSI to receive the proceeds.

Bellboy, and such breach constitutes a complete defense to Imgarten's claim.  The Court will address and reject each ground in turn.

### A.   Absence of "Bona Fide Dispute."

The jury specifically concluded that there was no "bona fide dispute" as to $91,158 of Imgarten's 1999 wages and $32,169 of his 2000 wages.  In doing so, the jury adopted numbers put forward by Bellboy's own expert, Larry Epstein.  Epstein testified that under Bellboy's view of the bonus agreement (30% of net profits), Bellboy owed Imgarten $91,158 for 1999 and $32,169 for 2000.[38]  (Docket No. 212, Exs. A & B.)  Epstein's testimony amply supports the jury's conclusion that a bona fide dispute did not exist as to those amounts.

Bellboy argues that substantial evidence demonstrated a "bona fide dispute" as to the entire amount of the 1999 and 2000 wages.  Bellboy's argument is misplaced for two reasons.  First, the Court excluded much of the evidence to which Bellboy now points (uncollectible accounts receivable, bad debts, and missing inventory that allegedly reduced Bellboy's profitability) because Bellboy failed to disclose it properly.  Second, Bellboy is merely rehashing evidence that Imgarten disputed and the jury rejected.  The Court may grant a Rule 50 motion only when there is "no legally sufficient evidentiary basis for a reasonable jury to find for [the opposing] party on [a certain] issue."  Fed. R. Civ. P. 50(a).  The Court "must draw all reasonable inferences in the nonmovant's favor without weighing the evidence or assessing the witness'

---

[38]  Bellboy claims that these figures did not include certain deductions (bad debts, missing inventory, uncollectible accounts receivable) that reduced Bellboy's profitability and, likewise, Imgarten's wages for those years.  During discovery, however, Bellboy failed to disclose specifics regarding these items and their effect on Bellboy's bottom line.  In addition, Bellboy never restated its financial statements to account for these items.  Accordingly, the Court ruled that Bellboy could not use these items as evidence for the proposition that Imgarten was entitled to less wages.

credibility." <u>Pathways Psychosocial v. Town of Leonardtown</u>, 223 F. Supp. 2d 699, 706 (D. Md. 2002). If reasonable minds could differ, the Court must deny the motion. <u>Id.</u> Bellboy's motion improperly asks the Court to draw all inferences in its favor. This the Court cannot do, and Bellboy is not entitled to judgment as a matter of law on the "bona fide dispute" issue.

**B.**      **Statute of Limitations Defense for 1996 and 1997.**

On October 1, 2004, one business day before the beginning of trial, Bellboy moved to dismiss Imgarten's 1996 and 1997 wage claims based on a statute of limitations defense. Citing Maryland's general three-year statute of limitations, Bellboy claimed that Imgarten knew more than three years before filing suit that his 1996 and 1997 wages had not been calculated using his version of the profit-sharing agreement (35% of gross profits). The Court refused to allow this defense to go to the jury because Bellboy had never disclosed the specifics (<u>e.g.</u>, the dates on which the various limitations periods began to run) during discovery.

Bellboy has renewed its motion under the guise of Rule 50, asking the Court to reconsider its trial ruling. Bellboy argues that (i) Imgarten lacks standing to complain about the alleged failure of discovery, and (ii) Bellboy did, in fact, provide the factual basis of its statute of limitations defense during discovery. The Court will consider and reject each argument in turn.

**1.**      **Standing.**

In its Answer, Bellboy asserted a statute of limitations defense to plaintiff Michael Imgarten's wage claim. During discovery, a third-party defendant, Imgarten International, Inc.

("Imgarten International"),[39] posed an interrogatory seeking the factual basis of the defense.[40] Bellboy responded: "This affirmative defense was raised so as to avoid waiving same. As discovery is ongoing, this party reserves the right to supplement this Answer accordingly." (Docket No. 212, Ex. D.)  Bellboy never supplemented its response, however.

Bellboy claims that because Michael Imgarten did not author the interrogatory, he lacks standing to complain about Bellboy's failure to supplement.  This argument fails on several grounds.  Bellboy did not object to Imgarten International asking an interrogatory that related only to Michael Imgarten's wage claim.  Bellboy responded to the interrogatory as if it had been posed by Michael Imgarten himself.  Finally, there is no rule that all adverse parties, especially related ones, must ask identical interrogatories in order to rely on the answers.

## 2.   Bellboy Did Not Disclose the Basis of Its Statute of Limitations Defense.

Critical to a statute of limitations defense are: (i) the length of the limitations period, (ii) the date on which the period began to run, and (iii) why limitations began on that date as opposed to some other.  Before trial, Bellboy never disclosed to Imgarten its view that the limitations periods began to run on the dates when Imgarten received his wage checks and ended three years

---

[39] Imgarten formed Imgarten International, Inc. after resigning from Bellboy. Bellboy sued Imgarten International, Inc. as a third-party defendant.  The third-party complaint contained many of the same counts contained in Bellboy's counterclaim against Michael Imgarten.  Like the claims against Michael Imgarten, Bellboy's third-party claims were dismissed for failure of proof and failure of discovery.

[40] The interrogatory read: "State all facts upon which you rely for your contention in your Eleventh Affirmative Defense that Plaintiff's claims are barred by limitations." (Docket No. 212, Ex. D.)

later. Discovery disclosed when Imgarten received his wage checks, but Bellboy never tied those dates to its statute of limitations defense.[41]

Accordingly, the Court correctly refused to allow Bellboy to present its statute of limitations defense to the jury.

### C.    Material Breach Defense.

Bellboy contends that Imgarten's conversion of the Fuddruckers checks, alleged interference with the BX orders, and alleged theft of Bellboy's property constituted a material breach of his employment agreement that serves to completely bar his recovery under the Payment Law. For several reasons, the Court rejects Bellboy's argument.

First, Bellboy is merely rehashing factual allegations that were disputed by Imgarten and, with the exception of the Fuddruckers Claim, dismissed by the Court or rejected by the jury. Accordingly, the factual basis for Imgarten's materiality defense is missing.

Second, Bellboy did not list material breach as an affirmative defense to Imgarten's wage claim. Bellboy, therefore, waived the defense.[42] See Fed. R. Civ. P. 8(c) ("In pleading to a

_____

[41] There are at least four general dates that might be used to trigger limitations in this case: (i) the benchmark calendar period, (ii) the later date on which Bellboy closed the books on that period, (iii) the date on which Bellboy tendered a bonus check to Imgarten for that period, and (iv) the date on which Bellboy refused to pay Imgarten anything else. Faced with a proper interrogatory, Bellboy was obliged to state which date it chose and the facts supporting its choice as the legally correct one. It never did.

[42] Citing Rule 15(b) of the Federal Rules of Civil Procedure, Bellboy argues that evidence relating to its material breach defense was introduced at trial and that the Court should, therefore, treat its answer as having raised the defense. Bellboy's reliance on Rule 15(b) is misplaced. That rule provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The materiality issue was not tried to the jury, much less by consent, and Rule 15(b) does not apply.

preceding pleading, a party shall set forth affirmatively . . . any . . . matter constituting an avoidance or affirmative defense."); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1278 (3d ed. 2004) ("It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case.").

Third, Bellboy raised the materiality defense only as an afterthought at the very end of trial. Imgarten, therefore, had no opportunity to explore the issue of materiality in discovery or when examining witnesses during trial.

Finally, the Payment Law expressly limits the circumstances under which an employer may withhold wages. A material breach of an employment agreement is not one of the enumerated circumstances. See Md. Code Ann., Lab. & Empl., § 3-503 (1999). Accordingly, Imgarten's alleged material breach of his employment agreement cannot constitute a defense to Bellboy's statutory duty to pay wages.

## VII.   Imgarten's Pre-judgment Interest.

Imgarten requests pre-judgment interest on the sum of $808,927, which is the amount of unpaid wages that the jury awarded to him under the Payment Law.[43]  The Payment Law does not specifically address pre-judgment interest. The Maryland Court of Appeals has indicated, however, that pre-judgment interest can be awarded on a wage claim under general common law principles.[44]

---

[43]  Imgarten is not seeking pre-judgment interest on the $233,244 in enhanced statutory damages that the jury awarded him under the Payment Law.

[44]  In Admiral Mortgage, Inc. v. Cooper, 745 A.2d 1026 (Md. 2000), the Court of Appeals, while discussing the purpose of additional statutory damages under the Payment

Under Maryland law, there is a division of labor between the judge and the jury. The decision whether to award pre-judgment interest is usually reserved to the discretion of the fact-finder. Ver Brycke v. Ver Brycke, 843 A.2d 758, 777 (Md. 2004). The amount to be awarded is typically reserved to the presiding judge. In the instant case, both sides stipulated that the Court, and not the jury, would decide both issues.

In some cases, typically those involving liquidated claims, pre-judgment interest is available "as a matter of right." In other cases, e.g., claims involving personal injuries, pre-judgment interest is unavailable because the jury is placing a dollar value on an unliquidated claim for pain and suffering. Cases in the middle group fall to the discretion of the fact-finder. Buxton v. Buxton, 770 A.2d 152, 165 (Md. 2001).

Imgarten argues that his wage claim falls within the "matter of right" group. Bellboy not only disagrees, but urges the Court to exercise its discretion against awarding pre-judgment interest to Imgarten on any part of his claim. The Court disagrees with both propositions, but nevertheless will make a discretionary award to Imgarten to compensate him for the loss of the use of wages that should have been paid to him years ago.

## A.     The "Matter of Right" Exception.

The "matter of right" exception arises "when the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as

---

Law, stated that "[i]f payment is withheld, [working people] may face more than just the economic loss of the money, which pre-judgment interest allowable as a matter of common law ordinarily reimburses. . . . Recovery . . . of just the unpaid wages under § 3-507.1(a), even if accompanied by pre-judgment interest, may not begin to compensate for . . . consequential losses." Id. at 1034-35.

of a known date." <u>Buxton</u>, 770 A.2d at 165 (internal quotations and citations omitted).  In cases

involving contracts, this exception applies "if the contract requires payment of a sum certain on a

date certain," such as a bill of exchange or a promissory note, or if the contract provides for

payment of interest.  <u>Crystal v. West & Callahan, Inc.</u>, 614 A.2d 560, 572 (Md. 1992); <u>see</u> <u>also</u>

<u>Buxton</u>, 770 A.2d at 165.

     Imgarten is not entitled to pre-judgment interest as a matter of right.  His agreement with

his employer neither specified the payment of interest nor the date on which his bonus was to be

paid.  Rather, the agreement called for Imgarten to receive a share of Bellboy's future profits,

which could not be calculated until some future date.

     This case falls within the "broad category" of contract cases in which pre-judgment

interest is a matter of discretion.  <u>Buxton</u>, 770 A.2d at 165.  In an analogous case, the Maryland

Court of Appeals considered an oral home improvement contract.  Like the instant case, the

parties disputed the terms of their agreement.  The homeowner testified that the contractor had

estimated that the project would cost $10,000.  The contractor, on the other hand, testified that

the contract was on a time and materials basis, that he never gave an estimate of the total price,

and that the $10,000 estimate was for the cost for certain doors and windows that were only part

of the overall project.  <u>Crystal</u>, 614 A.2d at 562.

     The contractor's total bill was $23,769.78.  The homeowner made a "good faith" payment

of $2,000, but refused to pay the balance because the price was higher than the estimate and

because she was dissatisfied with the work.  <u>Id.</u>  The contractor sued to collect.  After a bench

trial, the lower court entered judgment for the contractor in the principal sum of $21,769.78 (the

full value of the work minus the $2,000 credit).  The court also awarded pre-judgment interest.
Id.

On appeal, the Maryland Court of Appeals affirmed the award of pre-judgment interest.
The Court of Appeals found that because the contractor's claim fell "somewhere in between" the
"matter of right" group and the unliquidated group, pre-judgment interest was "well within the
discretion of the finder of fact."  Id. at 572-73.

The "matter of right" exception is inapplicable to Imgarten's wage claim.  Nevertheless,
the Court has discretion in deciding whether to award Imgarten pre-judgment interest.

**B.     Court's Exercise of its Discretion.**

The purpose of pre-judgment interest is to compensate the aggrieved party for the
deprivation of money it was owed, primarily the income that the money could have earned.  I.W.
Berman Props. v. Porter Bros., Inc., 344 A.2d 65, 79 (Md. 1975).  Under Maryland law, the trial
court, which has substantial discretion, should be guided by the "equity and justice appearing
between the parties" as disclosed during trial.  Id. at 74.  The Court has no hesitancy in awarding
pre-judgment interest to Imgarten, who has been deprived for years of wages due him.  This
delay is attributable primarily to the time required to litigate the laundry list of wrongs alleged in
Bellboy's failed counterclaim.  Bellboy's failed claims delayed the outcome, and Bellboy should
recompense Imgarten for the delay.

Further tipping the scales of equity and justice in favor of Imgarten is the fact that Bellboy
had the use of the money (presumably as working capital) all those years.  Bellboy was in effect
"borrowing" Imgarten's wages, and it is equitable that Bellboy should pay a reasonable interest
rate on the sum it withheld.

After the summary judgment ruling that Bellboy had been profitable in 1999 and 2000, Bellboy should have realized that its chances of avoiding some payment to Imgarten were slim. Despite this, Bellboy never made an offer of partial judgment under FRCP 68 or offered to pay any sum into the registry of the Court.  Instead, Bellboy followed a scorched earth defense and offered nothing.  Maryland case law states that an award of pre-judgment interest is appropriate when the defendant has made no attempt to meet the plaintiff half way when it became clear that some amount of money was owed.  Crystal, 614 A.2d at 572; see also I.W. Berman, 344 A.2d at 77 (stating that trial court could have considered that "appellant had not undertaken, at any time up until the verdict to make a tender, even of the $38,582.29 concededly owed the appellee under its theory of the case").

In urging the Court to refuse an award of interest, Bellboy argues that Imgarten is not one of the "working people" whom the Payment Law is designed to protect.  The Court disagrees, as the Maryland courts have not limited the law to hourly employees.  Under the Payment Law, bonuses and salary, even of highly compensated executives, are defined as "wages."

Bellboy also argues that because Imgarten was awarded $233,244 in enhanced statutory wages, he has been made whole.  Such is not the case here.  Enhanced statutory damages serve the following two purposes: (i) they penalize the employer for withholding wages in the absence of a bona fide dispute, and (ii) they compensate the employee for consequential losses (such as late charges, eviction, and repossessions) resulting from the employee's inability to pay his bills or meet other financial obligations during the period in which wages were withheld.  See Admiral Mortgage, Inc. v. Cooper, 745 A.2d 1026, 1033, 1034-35 (Md. 2000).  Neither of these purposes concerns the reason for awarding pre-judgment interest, i.e., to compensate the

employee for the economic loss of the wages themselves. Furthermore, it would be illogical to use the enhanced damages as a reason for denying pre-judgment interest. Doing so would effectively nullify the award, thereby defeating the statutory directive that extra damages are appropriate when an employer has withheld wages in the absence of a bona fide dispute.

Reiterated throughout its briefs is Bellboy's argument that pre-judgment interest is inappropriate because the parties disputed the method for calculating Imgarten's wages (30% v. 35%, net v. gross profit) and it took a jury to resolve the dispute. The Maryland Court of Appeals, however, has upheld discretionary awards when the amount was disputed. See, e.g., Crystal, 614 A.2d 560.

For the above reasons, the Court exercises its discretion in favor of awarding pre-judgment interest to Imgarten.

### C.    Award of Pre-judgment Interest.

The Court will award pre-judgment interest at the "legal" rate of 6% per annum customary under Maryland law.[45]  Deciding the start date for the accumulation of interest is less straightforward.  For some bonus periods, Bellboy eventually sent Imgarten a check in an amount less than what the jury decided he was due.  Imgarten received checks anywhere from three to twelve months after the period ended.  For other periods, Bellboy sent no bonus check whatsoever.  Bellboy's controller testified that the numbers upon which profits were calculated were usually available in six to eight months, but that the IRS allowed nine months in which to close out the books.

---

[45] The parties agree that this is the appropriate rate.

41

The Court has decided that in those instances when Imgarten received an insufficient check, pre-judgment interest will begin to run on the date of the check. Presumably, the books had closed by that date. In those instances when Imgarten received no check, interest will begin to run nine months after the end of the bonus period.[46]   Interest for all bonus periods will run through September 8, 2005, the date on which the Court will enter final judgment in this case.

Applying the above method of calculation, Imgarten's pre-judgment interest is broken down as follows:

| Period Ending | Jury's Award of Unpaid Wages | Effective Date of Pre-judgment Interest | Pre-judgment Interest |
|---|---|---|---|
| 6/30/96 | $   1,735 | 12/6/96 (date of check) | $     912.08 |
| 6/30/97 | $116,474 | 9/11/97 (date of check) | $55,888.37 |
| 12/31/97 | $  94,039 | 9/24/98 (date of check) | $39,279.96 |
| 12/31/98 | $176,111 | 9/30/99 (9 months later) | $62,820.96 |
| 12/31/99 | $224,068 | 9/30/00 (9 months later) | $66,446.90 |
| 10/31/00 | $196,500 | 7/31/01 (9 months later) | $48,452.05 |
| Totals: | $808,927 | | $273,800.32 |

## VIII.   Bellboy's Pre-judgment Interest.

Bellboy seeks pre-judgment interest on the sum of $40,704.79, which is the stipulated value of the Fuddruckers checks that the jury concluded Imgarten wrongfully converted. Imgarten does not dispute that Bellboy is entitled to pre-judgment interest as a matter of right on

---

[46]  For the period ending December 1998, Imgarten received two checks, one in September 1998 and another on December 29, 1999.  For this bonus period, interest will begin in September 1999, nine months after the period's end.

the value of the Fuddruckers checks. <u>Buxton</u>, 770 A.2d at 165 ("Pre-judgment interest has been

held a matter of right as well in conversion cases where the value of the chattel converted is

readily ascertainable."); <u>see</u> <u>also</u> Docket 221 at n.3.

Accordingly, for each of the Fuddruckers checks that Imgarten converted, the Court will

award Bellboy pre-judgment interest calculated at the rate of 6% per annum from the date of the

check through September 8, 2005, when the Court will enter final judgment.[47]  Bellboy's pre-

judgment interest is broken down as follows:

| Date of the Check | Amount | Pre-judgment Interest |
|---|---|---|
| 8/26/99 | $21,160.23 | $7,669.85 |
| 11/11/99 | $ 9,255.42 | $3,237.62 |
| 7/13/00 | $ 5,966.00 | $1,846.68 |
| 8/15/00 | $ 4,323.14 | $1,314.70 |
| Totals: | $40,704.79 | $14,068.85 |

## IX.   Final Judgment.

### A.   Judgment Order.

The parties dispute the format of the final judgment order.  Imgarten asks the Court to

enter a single "final net judgment" in favor of Imgarten and against Bellboy.  Bellboy, on the

other hand, requests the Court to enter a separate judgment in favor of each party, rather than

netting the overall verdict.

---

[47] The parties agree that Maryland's general legal rate of 6% is the appropriate
rate in this case and that pre-judgment interest should run from the date of each check.

43

A net judgment can make it difficult for someone reviewing it to gain a sense of the adjustments the Court is making depending on the outcome of different claims.  To avoid this problem, the Court will enter a separate judgment in favor of each party for the respective amounts awarded.

**B.**     **Imgarten's Enhanced Statutory Damages for 2000.**

After the jury rendered its verdict, the Court of Special Appeals of Maryland held, as a matter of first impression, that the Payment Law's treble damages provision does not authorize treble damages in addition to the unpaid wage that was withheld absent a bona fide dispute. Rather, the statute caps an employee's award at three times that wage [i.e., (amount of wrongfully withheld wages) x (3 or less)].  Stevenson v. Branch Banking & Trust Corp., 861 A.2d 735, 757-59 (Md. Ct. Spec. App. 2004).

For the ten months ended October 31, 2000, the jury awarded Imgarten the unpaid wage that was not attributable to a bona fide dispute ($32,169) plus three times that wage ($96,507).[48]

---

[48] The jury's verdict regarding Imgarten's 2000 wages can be broken down as follows:

| | |
|---|---|
| Total Unpaid Wages: | $196,500 ($164,331 attributable to bona fide dispute + *$32,169* not attributable to bona fide dispute) |
| Additional Damages: | $ 96,507 (*$32,169 x 3*) |
| Total Award | $293,007 |

This is improper under <u>Stevenson</u>.  Accordingly, the Court will reduce the additional damages award for that period by $32,169.[49]

X.     **Conclusion.**

For the foregoing reasons, the Court will, by separate Order, (i) GRANT Imgarten's Motion for Attorneys' Fees and Costs under the Payment Law, (ii) AWARD Imgarten attorneys' fees under the Payment Law in an amount to be determined after Imgarten supplies additional information, (iii) AWARD Imgarten costs under the Payment Law in an amount to be determined after Imgarten supplies additional information, (iv) DENY AS MOOT Imgarten's Bill of Costs filed under FRCP 54(d), (v) DENY Bellboy's Bill of Costs filed under FRCP 54(d), (vi) DENY Imgarten's Rule 50 motion, (vii) DENY Bellboy's Rule 50 motion, (viii) AWARD pre-judgment interest to Imgarten in the amount of $273,800.32, (ix) AWARD pre-judgment interest to Bellboy in the amount of $14,068.85, and (x) REDUCE Imgarten's additional damages award for the ten months ended October 31, 2000 by $32,169. In addition, in the final judgment order to be entered on September 8, 2005, the Court will enter a separate judgment for each party for the respective amounts awarded.

Dated this 16th day of August, 2005.

$\mathcal{B}.\,\mathcal{Legg}$

Benson Everett Legg
Chief Judge

---

[49]  The revised award can be broken down as follows:

| | |
|---|---|
| Total Unpaid Wages: | $196,500 ($164,331 attributable to bona fide dispute + *$32,169* not attributable to bona fide dispute) |
| Additional Damages: | $ 64,338 (*$32,169 x 2*) |
| Total Award | $260,838 |

45